**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **KATHY BROKAW,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **CIVIL ACTION 09-0773-WS-C** |
| | ) |
| **WEISER SECURITY,** | ) |
| | ) |
| **Defendant.** | ) |

## ORDER

This matter comes before the Court on defendant's Motion for Summary Judgment (doc. 23). The Motion has been briefed and is now ripe for disposition.[1]

**I.    Nature of the Case.**

Plaintiff, Kathy Brokaw, is a former branch manager of the Mobile, Alabama office of defendant, Weiser Security Services, Inc. ("Weiser"). In her Complaint (doc. 1), Brokaw alleges causes of action under Title VII of the Civil Rights Act of 1964 for sex discrimination and retaliation, as well as a separate claim under the Equal Pay Act. More specifically, the Complaint asserts that Brokaw made repeated complaints of sexual discrimination by a Weiser client, for which Weiser retaliated against her, and that she was subjected to disparate treatment on the basis of her gender with respect to wages and termination. As for the Equal Pay Act theory, the Complaint asserts that Weiser paid Brokaw less than similarly situated male branch

---

[1]        Although it elected not to file a reply brief, defendant has requested oral argument. Pursuant to Local Rule 7.3, the Court in its discretion may rule on any motion without oral argument. After careful consideration of the parties' briefs, the undersigned is of the opinion that oral argument would not be helpful here, particularly as defendant waived its right to address plaintiff's summary judgment arguments via reply brief. Accordingly, Weiser's request for oral argument is **denied**. Furthermore, defendant's decision not to file a reply is at movant's peril, because federal courts generally do not develop arguments that the parties could have presented but did not. *See, e.g., Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment" and "the onus is upon the parties to formulate arguments").

managers who were performing jobs of equal skill, responsibility and effort. For its part, Weiser categorically denies wrongdoing and liability.[2]

## II.    Relevant Facts.[3]

### A.    Plaintiff's Hiring and Compensation.

Weiser, a contract security services company, hired Brokaw in August 2006 as branch manager for its Mobile office. (Brokaw Dep., at 25.)[4] Chuck Remington, Weiser's regional manager with responsibility for Alabama and northwest Florida, actively recruited Brokaw to fill a managerial vacancy in the Mobile branch, and she agreed to do so. (*Id.* at 61-62; Remington Dep., at 16-17, 117-18.)[5]

As branch manager, Brokaw had responsibility for the profitability of the Mobile office and for retaining existing clients. (Brokaw Dep., at 77, 80.) Brokaw recognized that her job was challenging because of the "many personalities" with whom she had to deal, including both Weiser employees and client representatives. (*Id.* at 83.) Throughout her employment at

---

[2]    This action is one of two related discrimination cases against Weiser pending in this District Court. The other action is styled *Oargarette Evans v. Weiser Security Services, Inc., et al.*, Civil Action No. 09-0445-M. There is identity of counsel and limited overlap of factual and legal issues between the two cases.

[3]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1365 (11th Cir. 2008) ("When ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited, and all justifiable inferences are to be drawn in the nonmovant's favor."). Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in her favor.

[4]    This was actually Brokaw's second stint as branch manager for Weiser. Defendant had previously employed her in that capacity from 1993 to 2000. (*Id.* at 49.) Brokaw does not maintain that Weiser discriminated against her during that initial stretch of employment. (*Id.* at 50.) In 2000, Brokaw voluntarily resigned her employment at Weiser to accept a position elsewhere. (Remington Dep., at 116.) Brokaw admits that the thought "ran across [her] mind" that Weiser might fire her in 2000 if she did not resign because she was experiencing difficulty selling accounts at that time. (Brokaw Dep., at 71.)

[5]    Remington had responsibility for overseeing operations at seven Weiser branches, including its offices in Oxford, Alabama; Atlanta, Georgia; Mobile, Alabama; Charlotte, North Carolina; High Point, North Carolina; Huntsville, Alabama; and Birmingham, Alabama. (Remington Dep., at 33.)

Weiser, clients provided feedback to defendant on Brokaw's performance on a monthly basis via written customer service reports (known as "CSRs"). (*Id.* at 67-68.) Brokaw would prepare these reports during monthly face-to-face site visits, at which she reviewed the account with the client and ascertained whether the client was satisfied and whether improvements were needed. (*Id.* at 139.)

Weiser hired Brokaw at a salary of $40,000 per year. (Brokaw Dep., at 65; Remington Dep., at 126.) According to Remington, her salary was set at that level because "[t]hat's the amount that [he] was given approval for that particular position." (Remington Dep., at 126.) Remington discussed the issue with his supervisor, Weiser Chief Operating Officer Leonard Kline, in the context of considering the overall productivity and hours per week generated by the Mobile area branch, which had lost business under the previous branch manager. (*Id.* at 127.) Brokaw's base salary remained constant throughout her employment at Weiser; however, she also received periodic bonuses based on reducing overtime hours (thereby cutting the company's labor costs), her performance (measured through client feedback), and overall guard hours per week (a measure of Weiser's business volume). (Brokaw Dep., at 66-68.)

Weiser paid Brokaw a lower salary than it had paid her predecessor, James Hipp. (Remington Dep., at 218-19.) Specifically, Weiser had hired Hipp at an initial salary of $40,000 per year in October 2003, but had given him a raise to $44,000 in August 2004, where his salary remained through his resignation in September 2006. (Lee-Sutherlin Aff. (Defendant's Exh. C.), ¶ 2.) Remington explained the difference between Hipp's and Brokaw's pay by saying that when Hipp's final salary was set "[t]he branch was larger in volume than when Ms. Brokaw came on." (Remington Dep., at 219.)

When Brokaw arrived at Weiser in August 2006, the company had approximately a dozen accounts in the Mobile area, plus four in the Florida panhandle. (Brokaw Dep., at 91.) The largest account serviced by the Mobile branch was nonparty Springhill Medical Center ("SMC"). (*Id.* at 63, 95.) Weiser viewed SMC as an account in jeopardy even at the time of Brokaw's arrival. (*Id.* at 95.) SMC's Director of Security, Andre McCoo, was the client representative and is of central importance to this narrative despite his nonparty status and his lack of agency affiliation with Weiser. (*Id.* at 96; McCoo Dep., at 14.) Brokaw testified that she "could sense" from the outset in 2006 that McCoo "did not care" for her. (Brokaw Dep., at 97.) Weiser staffed the SMC account with both rank-and-file security guards and S-1 supervisors,

who were "the only one[s] that could leave and rove through all the buildings. … [T]hey would make patrols throughout the hospital floors, just making a visible presence." (*Id.* at 261.)[6]

**B.    Plaintiff's Job Performance.**

*1.    Trouble with Non-SMC Accounts.*

Brokaw's hiring as Mobile branch manager coincided with a dismal period for Weiser's business in that area.  Indeed, Weiser lost two accounts serviced by the Mobile office roughly contemporaneously with Brokaw's arrival, including Masland Carpet (which terminated its contract before Brokaw even moved into her office) and Minolta (which shuttered its operations in Mobile altogether).  (Brokaw Dep., at 88, 99-100.)[7]  Aside from these two accounts (and SMC, which was already in jeopardy), no Weiser accounts serviced by the Mobile branch came into jeopardy after Brokaw took over in August 2006.  (*Id.* at 96.)  However, Weiser lost a third account, Great Southern Wood, under Brokaw's watch following an incident in which the client caught a Weiser employee stealing lumber at that location.  (*Id.* at 98.)  And Weiser lost a fourth account, Solutia, to a competitor during Brokaw's employment as branch manager.  (*Id.* at 101.)  Thanks to these account losses, the guard hours per week credited to the Mobile branch declined during Brokaw's employment.  (*Id.* at 88, 99-100.)

In September 2007, Weiser implemented an action plan for another large Mobile branch account, the Port of Panama City, based on the client's perception of a conflict between Brokaw and the site supervisor (a Weiser employee).  (Brokaw Dep., at 116-19; Defendant's Exh. I.)  According to Brokaw, the nature of the conflict was that the site supervisor had refused to communicate with her in a professional manner.  (Brokaw Dep., at 116-19.)  Remington viewed the problem differently, and described it as a situation in which Brokaw had addressed the site supervisor "in an unprofessional manner in front of people, and that caused the conflict where the client got involved."  (Remington Dep., at 151.)  Specifically, Remington understood, based on his investigation, that Brokaw had "raised her voice in a loud and unprofessional manner …

---

[6]    S-1 employees were paid a modest hourly wage premium of 26 cents as compared to ordinary Weiser security guards at SMC.  (Lee-Sutherlin Dep., at 69.)

[7]    Remington testified that Weiser lost the Masland Carpet account, which had been a large account, because of "[p]ersonnel issues," including security officers fraternizing with the client's employees.  (Remington Dep., at 134-35, 137.)

and counseled the supervisor in front of his subordinates." (*Id.* at 152-53.)[8]  The catalyst for the action plan was that the client had rated Brokaw (not the site supervisor) a 3 on a scale of 1 to 6 (with 1 being the lowest) in the CSR. (Brokaw Dep., at 116, 119, 121.)[9]  Weiser viewed this rating as flagging a "potential problem with this client," which was a notoriously difficult client to satisfy. (Remington Dep., at 146, 149.)  Although another manager was temporarily assigned to that account at Remington's suggestion, Brokaw resumed going there herself to prepare monthly CSRs sometime later. (Brokaw Dep., at 122-23; Remington Dep., at 147-48.)  After this action plan, Brokaw experienced no further problems with the Port of Panama City account. (Remington Dep., at 150.)

2.    *Performance Issues Specific to SMC.*

Brokaw's handling of the SMC account is the focal point of this case.  By all accounts, McCoo (SMC's Director of Security) was displeased with Weiser's service for quite some time, and his working relationship with Brokaw was, at best, rocky.

The record shows that McCoo consistently rated Brokaw's responsiveness favorably in monthly CSRs from June 2007 through September 2007, then abruptly reduced her rating to 3 in October 2007 before boosting it to a 5 in November 2007. (Remington Dep., Exh. 10; Defendant's Exhs. R, T, V.)  At least as early as October 2007, McCoo informed Brokaw that he was considering taking bids from other companies for the security account at SMC. (Brokaw Dep., at 171-73.)  In November 2007, Remington conducted an on-site meeting for all Weiser employees at SMC concerning this account, which was in jeopardy. (*Id.*)[10]

---

[8]    Notably, the client representative had reported to Remington that Brokaw was at fault for this interaction, inasmuch as Brokaw had rebuked the supervisor "improperly in a very, very embarrassing and unprofessional way." (*Id.* at 153.)  The client representative had also requested that Remington "keep Ms. Brokaw away from his property." (*Id.*)  Thus, Remington's perception was that Weiser's client had laid blame for the conflict squarely at Brokaw's feet.

[9]    Remington interpreted these CSR ratings in the following manner:  A rating below 3 signified "problems with the account," while a rating of 3 meant that the account was "borderline," and 4 or higher meant that the client was "satisfied." (Remington Dep., at 143.)  Whenever a client rates a manager 3 or lower, the manager is to notify Remington so that he may initiate any appropriate remedial action. (*Id.* at 144-45.)

[10]    Brokaw failed to attend that November 2007 meeting; however, plaintiff's testimony is that she was on-site that morning and "worked the ER so all these people could attend the meeting without working the post." (*Id.* at 172.)

On one occasion in October 2007, McCoo complained to Brokaw about security guards gossiping at SMC. (Brokaw Dep., at 238.) In response, Brokaw counseled three female guards for the complained-of activity, after being instructed to do so by Remington. (*Id.* at 282-83.) One of those guards became so "distraught" with the public manner in which Brokaw administered the rebuke that she prompted a Weiser investigation, as a result of which Remington counseled Brokaw for treating the employees so harshly. (Remington Dep., at 170, 172; Defendant's Exh. K.)

Perhaps the first indication from McCoo of a serious problem with Brokaw was in January 2008, when he scored her a 2 for quality of communications with the verbiage, "needs improvement." (Defendant's Exh. X.) By March 2008, McCoo rated Brokaw's quality of communications and responsiveness at 1, the lowest possible score, and added, "Kathy Brokaw ensures me the problem of signing in and out at the inappropriate time will cease. Communications, Integrity, + Client needs will have to be improved." (Defendant's Exh. Z; Brokaw Dep., at 184-85.)[11] McCoo's testimony was clear that he experienced a drop-off in Brokaw's service before there were ever any issues concerning sexual harassment complaints by Oargarette Evans or anyone else. (McCoo Dep., at 301.)

In March 2008, McCoo documented his mounting dissatisfaction and alarm with Weiser's service in a written memorandum wherein he stated that a Weiser guard named Rodney Munson was falsifying the sign-in sheet to claim pay for hours he had not worked, and that an S-1 (Evans) had lied to McCoo about making wheelchair rounds that she had not performed. (Brokaw Dep., at 188-89, 230.)[12] On that basis, McCoo eliminated Evans' and Munson's

---

[11]    McCoo testified that he expressed dissatisfaction to Remington in a pair of face-to-face meetings while Brokaw was branch manager. In particular, McCoo complained to Remington about Weiser employees spreading rumors around SMC and about Brokaw's performance, saying that she had "stopped being willing to treat us as the client, you know, whatever request we made from her, she was unwilling to accommodate us." (McCoo Dep., at 34, 39.) As examples, McCoo indicated that she would refuse to provide Weiser guards for certain posts upon request, that she would refuse to train employees but instead tell SMC to train them, and that she took an SMC incident report from its designated location on one occasion then refused to return it upon McCoo's request. (*Id.* at 39, 45-47.) McCoo did not mention gender-related staffing issues or concerns during either meeting with Remington.

[12]    McCoo's strongly worded memorandum was directed specifically at Brokaw. In particular, he wrote that he had previously spoken to her about Weiser employees signing in (Continued)

positions, and filled Evans' S-1 supervisor job internally with an SMC employee.  (*Id.* at 232-33; McCoo Dep., at 232-33, 235.)  Brokaw testified that she believed McCoo "was looking for any way to get rid of" Evans after she had "accused him of the sexual harassment."  (Brokaw Dep., at 276.)

### 3. Plaintiff's Interpersonal Interactions.

As discussed *supra*, Weiser experienced difficulties with the Port of Panama City account in the fall of 2007 following a public confrontation between Brokaw and a site supervisor.  That specific problem was corrected; however, in the view of Brokaw's supervisor, Chuck Remington, this episode was symptomatic of a much deeper concern, namely, that Brokaw "dealt with our employees in a rude manner, unprofessional manner, and that was the reoccurring theme."  (Remington Dep., at 151.)  Simply put, Remington perceived that Brokaw had exhibited a pattern of "repeatedly treat[ing] our employees with disrespect."  (*Id.* at 153.)  In addressing this matter with Brokaw via oral counseling, Remington "wanted her to understand that this cannot continue."  (*Id.* at 154.)

According to Remington, he had personally witnessed Brokaw treating employees shabbily, such as an incident in which Brokaw "in a very, very loud voice" had called an employee "a slob, or words to that effect."  (*Id.* at 159.)  Remington characterized Brokaw as "screaming" at the employee, rather than counseling her.  (*Id.* at 162.)  Remington counseled Brokaw about that inappropriate interaction on the spot.  (*Id.* at 165.)  More generally, Remington frequently heard from other employees that whenever Brokaw came around, "she would speak to them in a very, very unprofessional manner" and "in a very, very rude, brash manner."  (*Id.* at 159, 177.)  Brokaw's subordinates repeatedly notified Remington that her mannerisms were "very, very lacking in professionalism in dealing with folks."  (*Id.* at 160.)

---

incorrectly, that he perceived it to be "stealing" from SMC, that Brokaw's responsiveness had been lacking, and that "[i]t seems somewhere this was being **ignored or neglected**."  (McCoo Dep., Exh. 15 (emphasis in original).)  With regard to the Evans issue, McCoo expressed "shock that she would lie about a 'Customer Service' issue.  These issues can not go unaddressed."  (*Id.*)  The memorandum indicated that McCoo would not tolerate such conduct, and requested removal of both Weiser employees, with no Weiser replacements.  (*Id.*)  For her part, Brokaw denied that McCoo had ever previously notified her of the Munson sign-in issue.  (Brokaw Dep., at 188.)  Nonetheless, it is undisputed that McCoo eliminated the S-1 position that Evans had held, and that Munson was removed from the site permanently.  (*Id.* at 189-90.)

Remington received reports that Brokaw was "rude" to Weiser employees, that she talked down to them, and that she degraded them. (*Id.* at 167.) Weiser employees complained to Remington that Brokaw treated them "like dirt," that she would "huff and puff and walk[] away" from them, that she would refuse their requests for assistance, and that she would treat them like "dog[s]." (*Id.* at 180.) Other Weiser managers reported similar observations concerning Brokaw's interpersonal interactions. For example, Weiser's Vice President of Human Resources indicated that "there were a lot of instances where it was very difficult to deal with her. … It was just hard to communicate with her because … she had a tendency to not want to hear what other people were saying to her." (Lee-Sutherlin Dep., at 56.) Remington testified that he "sat down with [Brokaw] on many occasions and on the telephone and very sternly disciplined her verbally" for this conduct. (Remington Dep., at 180.) However, the record contains no written discipline directed at Brokaw.

For her part, Brokaw insisted that there was nothing wrong with the manner in which she treated employees and clients of Weiser. (Brokaw Dep., at 136.) Be that as it may, Remington "disciplined her and told her that her mannerism has got to change" in terms of her treatment of employees, to no avail. (Remington Dep., at 181.) Brokaw admits that during the last six to nine months of her employment, Remington would counsel her by making statements such as "Kathy, you just don't know how to talk to people." (Brokaw Dep., at 110.) He did so beginning in approximately September 2007. (*Id.* at 135-36.)[13] When Brokaw pressed him to elaborate, Remington would simply repeat that she did not know how to talk to people. (*Id.* at 136.)

### C. *Plaintiff's Purportedly Protected Activity.*

#### 1. *SMC Representatives' Statements and Conduct.*

Plaintiff contends that she encountered discriminatory actions and attitudes on the part of SMC client representatives toward female security guards. In particular, Brokaw believed that McCoo "didn't want women at all" to be sent by Weiser to work at SMC, especially for the S-1 supervisory position. (Brokaw Dep., at 259.) That said, Brokaw conceded that it was

---

[13]     Sometime earlier, in January 2007, Remington had assigned Brokaw to read and synopsize a book called *How Full is Your Bucket*, which is about giving positive feedback to people; however, plaintiff's evidence is that he gave her this assignment not as a form of reprimand, but pursuant to a "Gallop [*sic*] Poll program" initiated before she came to work at the company. (Brokaw Dep., at 112-16.)

"impossible" to send exclusively male security guards to SMC, and that close to half of the Weiser guards she assigned to the SMC account were women throughout her time as branch manager.  (*Id.* at 159, 244.)

Plaintiff's testimony is that McCoo or another SMC official named Jim Johnson would tell her after certain women were assigned to SMC that "[s]he just won't do" because "they wanted somebody that could manhandle people if they got in a fight."  (Brokaw Dep., at 249.) For S-1s, especially, Brokaw testified that Jim Johnson informed her that "he wanted them to be able to get in a fistfight, if they had to."  (*Id.* at 151.)  Brokaw expressed disagreement with that sentiment.  (*Id.* at 249-50.)  The record also shows, however, that SMC's disapproval was not confined to female guards.  When McCoo did not like a particular guard, he would call Weiser and demand the guard's ouster from the premises, and "[h]e did that with male and female guards" alike.  (Evans Dep., at 211.)  Also, in Brokaw's experience, neither male nor female employees enjoyed working at SMC because of the low pay and difficult interactions with McCoo and his staff.  (Brokaw Dep., at 158.)

In addition to SMC supervisors' stated preferences for male guards built like bar bouncers, there were several specific incidents that, plaintiff contends, demonstrate gender-based animus.  In February 2007, Jim Johnson requested that a Weiser S-1 named Rosie Johnson be removed from that position, in Brokaw's words, "due to being female and not being able to handle physical conflicts."  (Brokaw Dep., at 150, 245, 248; Defendant's Exh. Q.)[14]  Upon investigation, however, Remington determined that this employee's removal "wasn't just because she was a female," but that there were job tasks that Rosie Johnson was not performing.  (Remington Dep., at 224.)  There is no evidence that Brokaw resisted or otherwise opposed SMC's removal of Rosie Johnson.  Moreover, the record shows that Weiser continued to place females in S-1 positions at SMC, and that McCoo even singled female S-1s out for praise from time to time.  For example, McCoo gave favorable reports to Brokaw about two female S-1 security officers assigned by Weiser, namely, Ms. D. Bridges and Connie Craig, in late 2007 and early 2008.  (Brokaw Dep., at 180-82, 231; Defendant's Exhs. W, X, Y.)

---

[14]  This is so, even though SMC had singled out Rosie Johnson for praise just a few months earlier (in October 2006) for providing excellent service.  (Remington Dep., Exh. 10.)

Additionally, plaintiff's evidence is that McCoo informed Brokaw in June 2007 that he "did not want women valeting cars" because two female employees had previously gotten into an argument there, but that he would "be willing to give women a chance again at valeting." (Brokaw Dep., at 154; Remington Dep., at Exh. 10.)[15] The record is clear that Weiser continued to assign female valets to SMC at all relevant times. (Remington Dep., at 225-26.)

In January 2008, Weiser employee Oargarette Evans (who was assigned to SMC) reported to Brokaw for the first time that McCoo had sexually harassed her three months earlier by engaging her in a physically inappropriate and unwelcome manner in his office. (Brokaw Dep., at 210-12.)[16] Brokaw did not become an advocate or champion for Evans, nor did she confront McCoo about the issue; rather, Brokaw merely adhered to Weiser policy, serving as a conduit by relaying Evans' complaint to Remington and other Weiser officials, both orally and electronically. (*Id.* at 217.) The record reflects that SMC responded by notifying Weiser that it had instructed McCoo not to place himself in one-on-one situations with Evans, that it was conducting its own investigation, and that SMC emphasized to McCoo "that we expect him to conduct business with Ms. Evans in a normal course so that she may feel comfortable that her

---

[15] McCoo testified that the problem was not that SMC did not want female valets, but that women did not like walking back and forth from the valet spot to the ER, such that it was difficult to find female security guards willing to perform that task. (McCoo Dep., at 80.) According to McCoo, SMC "always had women valets" during Weiser's contract. (*Id.*)

[16] The record reflects a number of previous issues involving Evans. In August 2007, McCoo had objected to Weiser that Evans had been placed on duty "without any training." (Remington Dep., Exh. 10.) In October 2007, Weiser had removed Evans from her S-1 position (apparently with Brokaw's concurrence) for taking excessive time off; however, Weiser restored her to that job three weeks later. (McCoo Dep., Exh. 2.) Weiser returned Evans to the S-1 job because, in Brokaw's words, "[w]e did not have anybody to do that position. There are not many people willing to do it." (*Id.*) On summary judgment, plaintiff attempts to make hay out of testimony that McCoo said he wanted a male S-1 at the time of Evans' removal from that job. This argument is blunted by two countervailing facts. First, with regard to Evans' time off, Brokaw testified that, in her opinion, Evans had indeed requested excessive time off before being removed from the S-1 position. (Brokaw Dep., at 228.) Second, it is uncontroverted that when Evans was promptly restored to the S-1 position, Weiser did so at McCoo's explicit request that she be placed in that job. (Evans Dep., at 195-96.) Also, Brokaw had disciplined Evans in November 2007 for spreading gossip at SMC and had informed Evans that failure to correct the problem could result in suspension or termination. (Defendant's Exh. L.)

complaint has no bearing on her work assignment or the expectations [McCoo] has of her as a subordinate." (McCoo Dep., Exh. 13.)

Other than Rosie Johnson and Oargarette Evans, Brokaw cannot name any other female guards against whom she contends SMC discriminated. (Brokaw Dep., at 250.)

    2.    *Plaintiff's Reports of SMC Representatives' Statements and Conduct.*

It is undisputed that plaintiff reported to Weiser on multiple occasions that McCoo had told her he wanted men instead of women to be assigned to SMC. (Brokaw Dep., at 196.)[17] Indeed, Brokaw informed Remington within weeks after she commenced employment at Weiser that McCoo had stated a preference for male guards, but Remington "just brushed [her] off" on that issue. (Brokaw Dep., at 238-39.) Brokaw says that she reported discrimination by SMC to Remington and other Weiser officials on "[m]any occasions" and "many times over." (*Id.* at 242-43.) Plaintiff does not say that she ever requested that Weiser take any formal corrective action toward McCoo. Nor does Brokaw suggest that she altered her employee assignment patterns in a gender-based way based on McCoo's statements. Instead, she simply brought the matter to Weiser's attention. The latest occasion on which Brokaw reported this concern to Weiser was in a three-page memorandum to Remington dated March 13, 2008, wherein she documented her recent contentious interactions with McCoo and accused him of being "hostile" and "nasty" in a meeting with her. Buried at the bottom of the second page of that memorandum was a single sentence reading as follows: "There have been at least 2 separate occasions he has told me he wanted men and not women at the hospital." (Defendant's Exh. BB, at 2.) Nothing in the March 13 memorandum suggested that McCoo had made such statements recently, that McCoo was refusing to accept female employees assigned to SMC with any greater frequency than male employees, that McCoo had confronted Brokaw about the gender of the employees she sent to SMC after making those statements, or that Brokaw's report of these statements was anything more than a rehash of stale conversations that had occurred many months (perhaps more than a year) earlier. And the March 13 memorandum did not request any intervention,

---

[17]    Remington confirmed that "Ms. Brokaw would inform [him] that she felt that Mr. McCoo preferred male guards, she felt." (Remington Dep., at 223.) For his part, McCoo denies having ever told Brokaw that he did not want female Weiser employees at SMC. (McCoo Dep., at 82.) For summary judgment purposes, of course, this and all other conflicts in the record are resolved in the manner most favorable to Brokaw.

corrective action, or protection by Weiser with respect to McCoo's purported statement that "he wanted men and not women."

According to plaintiff, when she raised these concerns in 2006 or 2007 Remington directed her "to handle it, to give him what he wanted, and to quit fighting putting women out there." (Brokaw Dep., at 243.) But plaintiff does not controvert Weiser's evidence that Remington also informed Brokaw "that Weiser will not discriminate putting anyone in any certain position or discriminating against them based on their sex," that McCoo had never told Remington that any positions at SMC were open solely to men, and that any employee that Brokaw sent to SMC should be "the best qualified person," irrespective of gender. (Remington Dep., at 228.) Brokaw responded to Remington's guidance by voicing apprehension that she would get into trouble with McCoo if she did not staff the account as he wished. (*Id.* at 228-29.) Nonetheless, Remington did not perceive any of McCoo's complaints about Brokaw to be related to gender based on his meetings with McCoo, wherein the client identified concerns about the performance of both male and female guards. (*Id.* at 229-30.)[18] Also, Weiser's Vice President of Human Resources, Charlene Lee-Sutherlin, was not alarmed by Brokaw's complaints "[i]n passing" that McCoo had expressed a preference for male guards because "she didn't say that she, you know, felt like she couldn't hire a woman out there. We were still hiring women." (Lee-Sutherlin Dep., at 62.) Lee-Sutherlin also noted that "it's not uncommon" for clients to request exclusively male guards or physically imposing guards, and that when such requests are made, Weiser explains to the client that it will not discriminate based on any protected class status. (*Id.* at 62-63.) For her part, Brokaw testified that she implemented Weiser's policies, in the sense that she never refused to send a female guard to SMC and that she always sent the best qualified person available, whether male or female. (Brokaw Dep., at 157.)

There is no evidence that McCoo ever protested to Remington that Brokaw should not send female guards to SMC or should not assign women to serve in an S-1 capacity. It is

---

[18]     Specifically, Remington testified that in his meetings with McCoo, they "talked about the issues about the S-1, male/female, it was strictly based on their performance. And this is based on my conversations face-to-face with the client." (Remington Dep., at 230.) Thus, after hearing Brokaw's concerns that McCoo preferred male guards, Remington conferred with McCoo and satisfied himself that gender issues were not factoring into McCoo's staffing directives with respect to Weiser employees.

uncontroverted that Brokaw continued to assign females to SMC both as guards and as S-1 supervisors, and that McCoo and SMC accepted and on occasion commented favorably on the performance of those women.  There is no evidence that Brokaw ever spoke with, confronted or addressed McCoo concerning Evans' complaint of sexual harassment or about Jim Johnson's statement that Rosie Johnson should be removed from her position because, in part, she was female.  And there is no evidence that Brokaw opposed what appears to be her own decision (or, at least, recommendation) to remove Evans from the S-1 position temporarily for requesting excessive time off.

### D.  Plaintiff's Discharge.

Weiser terminated Brokaw's employment on June 16, 2008, some 22 months after she became branch manager.  (Brokaw Dep., at 110-11.)  According to Remington, he believed he had given Brokaw a fair opportunity to improve herself before terminating her employment.  (Remington Dep., at 105.)  Remington made the recommendation to his supervisor, Leonard Kline, that Brokaw be discharged, and that recommendation was approved.  (*Id.* at 231.)  From Remington's standpoint, it seemed clear that SMC's confidence in Brokaw had eroded, and he was attempting to save the account by implementing a change at the branch manager level.  Lee-Sutherlin wrote that Weiser discharged Brokaw "for continual complaints about the way she treated people as well as the amount of business that was lost during her tenure as a Branch Manager."  (Defendant's Exh. DD.)

On the very day that Weiser fired Brokaw, McCoo notified Remington that SMC was cancelling the contract with Weiser.  (Brokaw Dep., at 252-53; Remington Dep., at 183-84, 233.)  Even after McCoo learned that Weiser had discharged Brokaw, SMC proceeded with the cancellation.  In that regard, McCoo explained to Remington that "he just felt that it was time for him to look elsewhere."  (Remington Dep., at 200.)[19]  In his deposition, McCoo indicated that he

---

[19]     An internal "Lost Account Audit" prepared by Weiser and dated July 22, 2008, reflects that McCoo indicated that he "Did not get along with K. Brokaw.  Customer Svc poor." (Remington Dep., Exh. 16.)  Remington added his comments attributing the loss to "Mgr's inability to work harmoniously w/ client; failure to meet clients expectations; Mgr not treating employees with respect."  (*Id.*)  Remington opined that Weiser lost the SMC account because of Brokaw's poor treatment of employees at that location, and her inability to deal effectively with the client.  (Remington Dep., at 176.)  In that regard, McCoo had expressed to Remington his (Continued)

proceeded to cancel SMC's contract with Weiser even after Brokaw's ouster because Remington had not followed through on assurances that he would take care of problems McCoo had raised. (McCoo Dep., at 91-92.)  As McCoo put it, "It was a combination of Mr. Remington, Kathy Brokaw, and the other things that caused me to want to go in another direction."  (*Id.* at 92.)

Following Brokaw's dismissal, Weiser hired Jack Sturgill to replace her as the Mobile branch manager.  (Remington Dep., at 208.)  Remington recommended that Weiser pay Sturgill a salary of $40,000.  (*Id.* at 217.)  However, Sturgill had indicated that he would incur additional expenses for upgrading his wardrobe and for relocating to the Mobile area from Virginia.  (*Id.* at 215, 217.)  Although Remington was unaware of Weiser paying wardrobe supplements to any other managers, he also testified that he had never recruited and assigned a manager to a new area as quickly as he had in Sturgill's case.  (*Id.* at 218.)  Defendant's records confirm that Weiser hired Sturgill in June 2008 at a base salary of $40,700, or $700 more per year than Brokaw had been paid.  (Remington Dep., Exh. 20.)  Sturgill testified that Remington said the extra $700 was to help him upgrade his wardrobe.  (Sturgill Dep., at 54.)

### III.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law."  Rule 56(c), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be

---

"anger and frustration" with Brokaw, and his determination that he simply could not deal with her anymore.  (*Id.* at 188.)

believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004). Rather, "the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." *Id.* at 1086 (citation omitted).

**IV. Analysis.**

> **A. McDonnell Douglas *Burden-Shifting Framework*.**

The parties' respective summary judgment arguments on Brokaw's discrimination and retaliation claims under Title VII are properly evaluated using the time-honored *McDonnell Douglas* standard. Absent direct evidence of discrimination or retaliation by Weiser (which has not been presented here), Brokaw must make a showing of circumstantial evidence that satisfies the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this familiar burden-shifting analysis, plaintiff is required to make out a *prima facie* case of sex discrimination and/or retaliation.[20] If she does so, that showing "creates a rebuttable presumption that the employer acted illegally." *Underwood v. Perry County Com'n*, 431 F.3d 788, 794 (11th Cir. 2005).

At that point, "the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. ... If the employer does this, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination." *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008) (citations and internal quotation marks omitted); *see also Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997) (outlining similar procedure for Title VII retaliation claims). A plaintiff may establish pretext

---

[20] Brokaw's burden of establishing a *prima facie* case is not heavy. *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) ("the *prima facie* requirement is not an onerous one").

"either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Brooks v. County Com'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation omitted). Either way, "[i]f the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. ... Quarreling with that reason is not sufficient." *Wilson*, 376 F.3d at 1088; *see also Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1278 (11th Cir. 2008) ("It is the plaintiff's burden not merely to raise a suspicion regarding an improper motive, but rather to demonstrate there is a genuine issue of material fact that the employer's proffered reason … was pretextual."). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007). Thus, "[i]f the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (*en banc*).

### B.    Plaintiff's Title VII Retaliation Claim.

The Complaint alleges that Weiser "retaliated against the plaintiff for complaining about sexual discrimination in the terms, conditions and benefits of her employment, culminating in her discharge." (Doc. 1, ¶ 29.) Plaintiff's summary judgment filings confirm that this claim is focused on Brokaw's termination.

To establish a *prima facie* case of retaliation under Title VII, Brokaw must show that "(1) [s]he engaged in a statutorily protected activity; (2) [s]he suffered an adverse employment action; and (3) [s]he established a causal link between the protected activity and the adverse action." *Bryant v. Jones*, 575 F.3d 1281, 1307-08 (11th Cir. 2009); *see also Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1212-13 (11th Cir. 2008) ("To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events.") (citation omitted). On summary judgment, defendant does not challenge Brokaw's ability to satisfy the first two elements of the *prima facie* test, but instead argues that

there is no causal link between Brokaw's reports of SMC's gender-based staffing preferences and her discharge.[21]

"To show causation, a plaintiff in a retaliation case need prove only that retaliatory animus was one factor in the adverse employment decision." *Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010.) With respect to the causal link element, the law is clear that "close temporal proximity may be sufficient to show that the protected activity and the adverse action were not wholly unrelated." *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008). That said, "for temporal progression to be enough, the events must be in 'very close' proximity." *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 978 n.52 (11th Cir. 2008) (citation omitted). Thus, "in the absence of other evidence tending to show causation, if there is

---

[21]   Because defendant has not argued that the first two elements are unfulfilled here, the Court will not *sua sponte* explore whether, for example, Brokaw's reports of McCoo's stated preference for male guards amount to statutorily protected activity under Title VII. By all appearances, it could be persuasively argued that Brokaw's March 2008 letter is not protected activity because Brokaw lacked "a good faith reasonable belief that the employer was engaged in unlawful employment practices." *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010) (citation omitted). While McCoo had stated a preference for male security guards as far back as August 2006, such a statement (in isolation) is not an "unlawful employment practice" unless SMC was acting on that preference in some way. *See id.* (complaint about message stating that plaintiff's job was in jeopardy was not objectively reasonable because defendant had taken no action seriously affecting plaintiff's employment). Brokaw admits that she continued to send female employees (S-1 supervisors and regular security guards) to SMC in nearly equal numbers as male employees throughout her employment. Moreover, there is no evidence that McCoo rejected female S-1s or guards with any greater frequency than male S-1s or guards. Certainly Brokaw identifies no evidence that McCoo had dismissed or demoted a female guard because she was female at any time within months preceding her March 2008 letter, or even that he had expressed such a preference within reasonable proximity to the March 2008 letter. So it is far from clear to this Court that Brokaw's act of reminding Remington as an aside in March 2008 that on two occasions (apparently long before that date) McCoo had stated a preference for male guards qualifies as protected activity within the meaning of Title VII, especially where Brokaw was merely reiterating stale information that she had previously disclosed as far back as 18 months earlier, with no apparent good-faith basis for believing that McCoo was acting on those preferences as of early 2008. If anything, it appears that by including this isolated sentence in her March 2008 letter, Brokaw was improperly trying to manipulate Title VII's retaliation provisions by fabricating a protected activity to insulate herself from adverse action that she must have suspected to be in the offing. *See Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1270 (11th Cir. 2010) ("We emphasize that Title VII's anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint.").

a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Brown*, 597 F.3d at 1182 (citation omitted).

Plaintiff's sole causation argument is that the March 13 memo (the latest instance of protected activity she cites) supplies the necessary close temporal proximity to establish a causal link between protected activity and adverse action. (Doc. 28, at 17-18.)[22] The Court disagrees. The only adverse action identified by Brokaw is her discharge, which occurred on June 16, 2008, more than three months after the March 13 memo. Binding authorities unequivocally instruct that, without more, a three-month period between protected activity and adverse action is insufficient to show a causal connection. *See, e.g., Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."); *Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004) (three month period, by itself, "does not allow a reasonable inference of a causal relation between the protected expression and the adverse action").

In an effort to evade the effects of the *Thomas / Higdon* line of authorities, plaintiff argues that "within days or weeks" of the March 13 memo "Weiser had decided to end her employment as they were already soliciting and interviewing her male replacement." (Doc. 28, at 18.)[23] This contention is unpersuasive for several reasons. First, plaintiff does not explain how (and does not provide any authority supporting the proposition that) Weiser's act of communicating with and recruiting a potential new hire constitutes an adverse action as to

---

[22] Recall that in the March 13 memorandum, Brokaw included a single sentence that McCoo had previously stated a preference for male guards at SMC. Further recall that these sorts of client comments are "not uncommon" in Weiser's line of work, that Weiser's policy is to send the best qualified persons available to a job regardless of gender, that Brokaw had been reminded of this policy by Weiser managers, that Brokaw had continued sending roughly 50% female guards to SMC throughout her employment, that McCoo had gone out of his way to praise certain of those female guards, that he was not dismissing female guards with greater frequency than male guards, and that Remington had confirmed to his satisfaction that McCoo's issues with specific female guards had been performance-based, not gender-based. In short, this sentence in the March 13 memo was nothing fresh, new, or remotely revelatory, but was instead well-trodden ground for Brokaw, Weiser and SMC.

[23] The record in the light most favorable to plaintiff reflects that Weiser first contacted Jack Sturgill about possible employment in March or April 2008, but did not discuss any specific location or branch with him at that time. (Sturgill Dep., at 15-16.) Weiser interviewed Sturgill in New Orleans in May 2008. (*Id.* at 41-42.)

Brokaw for retaliation purposes, when she was unaware of such contact and retained her same job title and pay for months thereafter. Second, plaintiff does not cite any authority for her apparent contention that the "adverse action" should be deemed to occur at the moment when Weiser decided to end Brokaw's employment (whenever that may have been), rather than when it actually fired her on June 16. *See generally Federal Ins. Co. v. County of Westchester*, 921 F. Supp. 1136, 1139 (S.D.N.Y. 1996) ("Under the adversary system, it is counsel's responsibility to explain why these points have legal merit; the Court does not serve as counsel's law clerk."). Third, plaintiff is taking unwarranted liberties with the record in arguing that Weiser decided to fire her within days or weeks of the March 13 memo. Certainly, no Weiser representative testified in that fashion, and the mere fact that Weiser was reaching out to a possible replacement branch manager cannot reasonably constitute proof that Weiser had irrevocably finalized a decision to terminate Brokaw's employment, especially when it kept her on for a period of months thereafter.[24] Plaintiff has pointed to no evidence showing when Kline decided to adopt Remington's recommendation and discharge Brokaw. The requisite causal nexus cannot be grounded in feeble speculation of this sort, yet that is all plaintiff offers here.

Fourth, the most fundamental problem with plaintiff's attempt to derive a causal link from the March 13 memorandum is that she identifies no record evidence tending to show that the undisputed decisionmaker, Leonard Kline (the Chief Operating Officer of Weiser), was even aware of that March 13 memo or the lone sentence therein referencing McCoo's purported preference for male guards. Brokaw addressed the March 13 memo solely to Remington, and the document does not reflect that a copy was sent to Kline. (Defendant's Exh. BB.) The record unambiguously shows that Remington merely recommended Brokaw's dismissal, but that Kline ultimately made the discharge decision. (Remington Dep., at 231.) Without proof that Kline was aware of ostensibly protected conduct by Brokaw within close temporal proximity of the adverse action, Brokaw cannot establish the requisite causal connection. *See, e.g., Goldsmith v.*

---

[24] If merely contemplating termination were enough to constitute an adverse action under Title VII, then it would seem to be the rare case indeed where a causal nexus was not present, not to mention all the proof problems inherent in attempting to determine when an employer began thinking about discharging an employee. Plaintiff identifies no authorities adopting a "thinking-about-adverse-action" standard for evaluating the causal link requirement in the Title VII retaliation context.

*Bagby Elevator Co.*, 513 F.3d 1261, 1278 (11th Cir. 2008) (to prevail on retaliation claim, "the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action.") (citations omitted). Plaintiff points to no record evidence that Remington or anyone else at Weiser forwarded a copy of the memo to Kline, or even notified him of its contents (including the purportedly protected activity therein).[25]

For all of these reasons, defendant's argument that plaintiff has failed to make a *prima facie* case of retaliation is well taken because of the dearth of evidence of a causal link between her purportedly protected activity and the adverse action. The nexus between plaintiff's inclusion of a throwaway sentence devoted to rehashing stale information based on a commonly-raised Weiser customer comment relating to someone who did not even work for Weiser in a three-page memorandum directed to someone else who was not even the decisionmaker, on the one hand, and Weiser's discharge of plaintiff three months later, on the other, is far too attenuated to give rise to the necessary causal connection for a *prima facie* showing of retaliation. On that basis, defendant's Motion for Summary Judgment is **granted** as to Brokaw's Title VII retaliation cause of action.[26]

---

[25]    Even though plaintiff has not invoked it, the Court is aware, of course, that in certain circumstances the "cat's paw" theory may enable a non-decisionmaker's retaliatory animus to be imputed to a decisionmaker who harbors no such animus. *See Crawford*, 529 F.3d at 970 n.21 ("Under a 'cat's paw' theory, a non-decisionmaking employee's discriminatory animus may be imputed to a neutral decisionmaker when the decisionmaker has not independently investigated allegations of misconduct."). Remington, as recommender, was on notice of the March 13 protected activity when he recommended Brokaw's dismissal to Kline. Accordingly, if the "cat's paw" theory applied, then Remington's knowledge could be imputed to Kline despite the latter's lack of knowledge. But plaintiff does not identify any record evidence of the kinds of supporting facts necessary to trigger a cat's paw theory of liability; therefore, the Court cannot find its existence here. *See generally Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (recognizing "cat's paw" theory of causation only "if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee[, and] … the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus").

[26]    Elsewhere in her brief, plaintiff insinuates that her retaliation claim against Weiser may be predicated on retaliatory actions of McCoo (who, again, was Director of Security for SMC and not a Weiser employee or agent). (Doc. 28, at 22.) Plaintiff does not develop the legal underpinnings of this theory in any meaningful way. On its face, any effort to cast McCoo (a nonparty employed by a Weiser client) as the retaliator would fail for the following reasons: (Continued)

### C.    *Plaintiff's Equal Pay Act and Title VII Wage Discrimination Claims.*

Brokaw's Complaint also asserts causes of action for gender-based pay discrimination under both Title VII and the Equal Pay Act.[27]  Defendant contends that it is entitled to summary judgment on both types of discriminatory pay claims because the meager differences in salary between Brokaw and certain of her male counterparts at Weiser were unrelated to gender.

### 1.    *Equal Pay Act Claim.*

By its terms, the Equal Pay Act ("EPA") generally forbids an employer from discriminating "within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1).  That said, the EPA exempts employers from liability for such pay discrepancies where they result from "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any factor other than sex." *Id.*[28]

---

(i) there is no evidence that McCoo was aware of any of Brokaw's internal complaints to Weiser about his alleged preference for male guards, whether on March 13 or at any other time; (ii) there is no evidence that Brokaw had resisted or opposed any discriminatory instructions or requests by McCoo for a period of months before her dismissal, as the incidents cited in plaintiff's brief date back well before the June 2008 termination (doc. 28, at 3-7); (iii) McCoo was not the decisionmaker for the adverse action of which Brokaw complains in this action; and (iv) there is abundant record evidence that Remington conducted his own investigation of Brokaw's job performance and did not just blindly accept McCoo's criticisms of plaintiff as his basis for recommending termination, such that the "cat's paw" theory can have no application to McCoo's purportedly retaliatory animus.

[27]    In particular, the Complaint alleges that Weiser subjected Brokaw to "disparate treatment on the basis of her gender, female, in the terms, conditions and benefits of her employment, including her wages." (Doc. 1, ¶ 30.)  The Complaint further alleges as a separate cause of action that Weiser "willfully violated the Equal Pay Act by paying the plaintiff unequal wages to those of similarly situated males performing a job of equal skill, responsibility and effort under similar working conditions." (*Id.*, ¶ 38.)

[28]    Weiser's brief emphasizes the ostensibly *de minimis* differential at issue; however, the magnitude of the differential is irrelevant for EPA purposes. *See, e.g., Hodgson v. American Bank of Commerce*, 447 F.2d 416, 420 (5th Cir. 1971) ("Any wage differential between (Continued)

In this Circuit, a plaintiff establishes a *prima facie* case under the EPA "by showing that the employer paid employees of opposite genders different wages for equal work for jobs which require equal skill, effort, and responsibility, and which are performed under similar working conditions." *Steger v. General Elec. Co.*, 318 F.3d 1066, 1077-78 (11th Cir. 2003). To meet this requirement, Brokaw shows that she was paid $40,000 as Weiser's Mobile branch manager, while her male predecessor (Hipp) was paid $44,000 and her male successor (Sturgill) was paid $40,700. Defendant prudently concedes that this showing is adequate to satisfy Brokaw's *prima facie* burden under the EPA.

Where a plaintiff makes a *prima facie* showing under the EPA, the defendant "may avoid liability by proving by a preponderance of the evidence that the pay differences are based on … any other factor other than sex." *Steger*, 318 F.3d at 1078 (citation omitted).[29] This is an

_____

the sexes, no matter how small and insignificant, is sufficient under the statutory prohibition."). Also, Weiser devotes a substantial portion of its brief to addressing as "comparators" managers of other branches. But Brokaw has not identified any of those individuals as comparators. Besides, they all worked at different branches than she did, so it is unclear why their compensation matters in the EPA analysis, which § 206(d)(1) says must be performed at the establishment level, not across different establishments. The Court will therefore focus its EPA discussion on the two male branch managers in Weiser's Mobile office, just as plaintiff does.

[29] Plaintiff insists that the "any other factor other than sex" defense is confined to "unique characteristics of the same job; … an individual's experience, training, or ability; or … special exigent circumstances connected with the business." (Doc. 28, at 24-26.) Plaintiff is incorrect. The Eleventh Circuit has explained that "any other factor other than sex" is properly construed as "a general exception to application of the EPA" and has not interpreted plaintiff's proposed listing of factors as exhaustive. *Irby v. Bittick*, 44 F.3d 949, 955 (11th Cir. 1995). Indeed, *Irby* explained that "[b]usiness reasons … are legitimate 'factors other than sex' so long as they can be rebutted." *Id.* at 956; *see also Nelson v. Chattahoochee Valley Hosp. Soc.*, --- F. Supp.2d ----, 2010 WL 3039829, *14 (M.D. Ala. Aug. 4, 2010) ("the temporary nature of a position is a factor 'other than sex' sufficient to justify an otherwise illegal pay disparity"). More generally, the Eleventh Circuit has emphasized that "[t]he 'factor other than sex' affirmative defense *is a broad, catch-all exception to the Equal Pay Act, and should not be overly limited*." *Irby*, 44 F.3d at 956 n.10 (emphasis added); *Nelson*, 2010 WL 3039829, at *14 (characterizing "any other factor other than sex" defense as a "catch-all" provision); *Seldon v. Total System Services, Inc.*, 653 F. Supp.2d 1349, 1363 (M.D. Ga. 2009) (applying "catch-all affirmative defense" to EPA liability). The Court therefore rejects Brokaw's attempt to constrain the EPA affirmative defense to a narrow band of specifically delineated, predetermined exceptions.

affirmative defense, and the defendant's burden of proof is "heavy," in the sense that the employer "must demonstrate that the factor of sex provided *no basis* for the wage differential." *Id.* (citations and internal quotation marks omitted).  Weiser attempts to meet this heavy burden with respect to the disparities between Brokaw's salary and those of Hipp and Sturgill, respectively.

With respect to the latter, it is undisputed that Weiser paid Sturgill a starting salary that exceeded Brokaw's final salary by $700 per year when he replaced her in June 2008.  In its brief, defendant's counsel states that "[t]he $700 was offered to assist Sturgill in upgrading his wardrobe so that he could comply with Weiser's dress code for branch managers."  (Doc. 23-1, at 22.)  But where is the necessary evidence to bolster this representation of counsel?[30] Remington testified that he recommended to Kline that Sturgill be paid $40,000, not the $40,700 Sturgill ultimately received.  (Remington Dep., at 217.)  Remington further testified that "Mr. Kline came up with this figure" and failed to explain the exact mechanism, considerations and thought process dictating Kline's determination of the final salary.  (*Id.*)  The record lacks any explanation from Kline, Remington or anyone else as to how Kline came to fix a $40,700 salary figure for Sturgill.[31]  Remington also admitted that, to his knowledge, Weiser had never inflated any other branch manager's salary for purposes of upgrading their wardrobes.  (*Id.* at 218.)  To muddy the waters further, Weiser informed the EEOC that "Mr. Sturgill was paid more than Ms. Brokaw to aid in moving expenses" (Defendant's Exh. DD, at 2), without saying a word about wardrobe.  "Moving expenses" and "wardrobe upgrade" are not synonymous, yet defendant relied on one concept before the EEOC and the other in this Court.  In short, Weiser's proof as to

---

[30]     *See, e.g., Taylor v. Holiday Isle, LLC*, 561 F. Supp.2d 1269, 1275 n.11 (S.D. Ala. 2008) ("Unadorned representations of counsel in a summary judgment brief are not a substitute for appropriate record evidence."); Rule 56(c)(1)(A), Fed.R.Civ.P. (litigant on summary judgment asserting that particular facts are or are not disputed "must support the assertion by … citing to *particular parts of materials in the record*") (emphasis added).

[31]     To be sure, Weiser attempts to fortify its argument by pointing to testimony from Sturgill that Remington had told him the $700 was intended to help him with his wardrobe. (Sturgill Dep., at 54.)  But the Court is at a loss to understand, and defendant does not explain, how this blatant hearsay could possibly be reduced to admissible form at trial, given Remington's evident lack of recollection on the subject.  *See generally Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) ("On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form.").

Sturgill's pay is simply too ambiguous, too flimsy, and too internally inconsistent to satisfy its heavy burden under the EPA of proving its affirmative defense. The existence of genuine issues of material fact as to the real reason for the pay disparity between Brokaw and Sturgill necessitates **denial** of defendant's Motion for Summary Judgment as to the EPA cause of action concerning Sturgill. *See, e.g., Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 591 (11th Cir. 1994) ("by moving for summary judgment under the EPA, defendants thrust before the court … the strength of their own defense and must establish that there is an absence of any issue for jury resolution").

Plaintiff's EPA claim relating to Hipp stands on a different footing. In particular, it is undisputed that Weiser paid Hipp $4,000 more per year to be the Mobile branch manager than it paid Brokaw, who was hired into that post following Hipp's resignation. Weiser explains (and presents substantial record evidence showing) that the pay difference resulted from the decline in the Mobile branch's revenue during Hipp's employment. In that regard, Remington's testimony unequivocally advanced this explanation for the difference in compensation. (Remington Dep., at 219; Defendant's Exh. DD, at 2.) Defendant's evidence specifically shows that the Mobile branch's total reoccurring annual revenue fell by $1,069,727 during Hipp's employment. (Defendant's Exh. EE.)[32] It cannot be gainsaid that an employer may lawfully pay a new manager less money when the branch's revenues are far lower than they were when the old manager's pay was set. The Court finds that Weiser has satisfied its heavy burden of showing its affirmative defense that gender provided no basis for the difference in pay between Hipp and Brokaw as manager of Weiser's Mobile branch, and that the decay of the Mobile branch's revenue stream in the interim constituted the sole basis for the difference in compensation.

---

[32] In light of defendant's presentation of multiple forms of evidence documenting the seven-digit decline in revenues for the Mobile branch when Hipp was in charge, plaintiff's rejoinder that Weiser "has submitted no evidence of record of this alleged significant loss of revenue" is puzzling and inaccurate. (Doc. 28, at 25.) Remington's testimony about Mobile branch losses appears based on his own first-hand knowledge, and would therefore be admissible. And Weiser's tables showing financial losses would appear admissible under Rule 1006, Fed.R.Evid., as summaries of the relevant records. Surely, plaintiff had a full and fair opportunity in discovery to examine the underlying financial records if she wished to do so, yet she does not present any contrary documents or argument calling into question the veracity of defendant's summaries.

"Once the employer meets its burden of establishing an affirmative defense enumerated in § 206(d)(1), the plaintiff must rebut the explanation by showing with affirmative evidence that it is pretextual or offered as a post-event justification for a gender-based differential." *Leatherwood v. Anna's Linens Co.*, 2010 WL 2490753, *6 (11th Cir. June 17, 2010) (quoting *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995)). Plaintiff has not come forward with any affirmative evidence of pretext or *post hoc* justification, and therefore has failed to rebut the employer's affirmative defense. On that basis, the Court concludes that defendant is entitled to summary judgment on plaintiff's EPA claim relating to James Hipp.[33]

### 2. *Title VII Wage Disparity Claim.*

The Complaint shows that Brokaw's wage disparity claims are not limited to the EPA, but are also brought under Title VII. This is potentially significant, as the Eleventh Circuit has explained at length that "there is a significant difference between Title VII and the EPA as to both elements and burdens of proof." *Meeks v. Computer Associates Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994). On summary judgment, however, the parties' briefs devote minimal attention to analyzing the differences between Title VII and the EPA as they relate to plaintiff's pay disparity claims. Neither side suggests that the differing elements and burdens of proof between Title VII and the EPA for gender-based wage discrimination claims are in any way material to the outcome here.[34]

---

[33] In so finding, the Court recognizes that "[d]efendants must establish that there are no genuine issues of material fact regarding the validity of [their] affirmative defense to prevail upon their motion for summary judgment." *Seldon*, 653 F. Supp.2d at 1362; *see also Mulhall*, 19 F.3d at 591 ("by moving for summary judgment under the EPA, defendants thrust before the court … the strength of their own defense and must establish that there is an absence of any issue for jury resolution"). Upon consideration of that legal standard and the parties' memoranda, the Court finds that Weiser has presented sufficient evidence that no rational jury could conclude but that its proffered legitimate business reason (*i.e.*, reduction in branch revenue) actually motivated the wage disparity between Hipp and Brokaw, so as to defeat Brokaw's EPA claim based on that disparity as a matter of law.

[34] To the contrary, Weiser seems to argue that the Title VII wage discrimination analysis in this case is indistinguishable from that under the EPA. (*See* doc. 23-1, at 23-24.) And Brokaw mentions the Title VII aspect of her wage disparity claim only in passing by reciting the *prima facie* case requirements for pay discrimination under Title VII. (*See* doc. 28, at 24.) Given that both parties have failed to identify any meaningful difference in the analyses under Title VII and the EPA in this case, the Court will not strive to develop such arguments for them.

The undersigned's assessment is that, when applying the *McDonnell Douglas* framework to Brokaw's pay discrimination claims under Title VII, the result is unchanged from that in the EPA context. In Title VII terms, Brokaw has established a *prima facie* case of wage discrimination with respect to both Hipp and Sturgill, and Weiser has come forward with a legitimate nondiscriminatory justification for the pay differences as to both of them. With respect to Sturgill, Brokaw has made a sufficient showing of pretext to survive summary judgment, based on the weaknesses in the employer's proffered proof of its nondiscriminatory reason and the inconsistencies in its explanation. With respect to Hipp, however, Brokaw has failed to meet her burden of showing sufficient evidence of pretext to support a finding that the salary differential was "based on gender and that the discrimination was intentional, both of which Title VII requires." *Meeks*, 15 F.3d at 1020. Accordingly, and in the absence of any briefing or argument by the parties suggesting material differences in Brokaw's pay disparity claims under Title VII versus under the EPA, the Court **grants** defendant's Motion for Summary Judgment as to the Title VII pay disparity claim involving Hipp, and **denies** it as to the Title VII pay disparity claim involving Sturgill.

### D.       Plaintiff's Discriminatory Discharge Claim under Title VII.

Finally, the Complaint alleges a claim that Weiser terminated her employment because of her gender, in violation of Title VII. (*See* doc. 1, ¶ 30.) On summary judgment, Weiser recognizes that Brokaw is asserting such a cause of action, but discounts it with a cursory wave of the hand, stating in conclusory fashion that Brokaw "has also failed to produce sufficient evidence that she was discharged as a result of intentional gender discrimination." (Doc. 23-1, at 23.) By all appearances, movant would rest on its previous analysis of the retaliatory discharge claim to show that it did not terminate Brokaw's employment on the basis of her gender, either.

To frame the analysis in *McDonnell Douglas* terms, defendant does not maintain that Brokaw cannot make out a *prima facie* case. In the discharge context, a plaintiff may establish a *prima facie* case of sex discrimination by showing that "(1) she belongs to a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job." *Wilson*, 376 F.3d at 1091. The Court will not undertake to fill in the gaps by raising arguments concerning the quality or sufficiency of Brokaw's *prima facie* case of sex discrimination that

Weiser itself failed to raise. *See, e.g., Baker v. Norman*, 651 F.2d 1107, 1129 n.26 (5th Cir. 1981) ("[A] district judge … is neither required nor permitted to become counsel for any party.").

Although its summary judgment brief does not couch it as such, defendant appears to have satisfied its intermediate burden under *McDonnell Douglas* by articulating a legitimate nondiscriminatory reason for Brokaw's dismissal. According to Weiser, "[t]he plaintiff was terminated because she did not know how to effectively communicate with clients and she repeatedly failed to treat her employees with even a minimal level of respect. This ultimately was a major factor in the Mobile branch's loss of four major accounts, including SMC." (Doc. 23-1, at 19-20.)

Defendant having met its burden of coming forward with a legitimate nondiscriminatory reason for the challenged action, "the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination." *Crawford*, 529 F.3d at 976; *see also Brown*, 597 F.3d at 1174 (once employer articulates reason, "the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason ... is a pretext for illegal discrimination") (citation omitted). As explained *supra*, plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Brooks*, 446 F.3d at 1163 (quotation omitted). If the "indirect" option is chosen, then the plaintiff's evidence "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 771 (11th Cir. 2005) (quotation omitted).[35]

Plaintiff has submitted substantial evidence of pretext here. With respect to Weiser's statement that Brokaw did not communicate effectively or respectfully with others, Brokaw presents evidence that Weiser did not terminate the employment of a male branch manager,

---

[35]     *See also Rioux*, 520 F.3d at 1278 ("The plaintiff must demonstrate weaknesses or implausibilities in the employer's proffered legitimate reasons for its action sufficient for a reasonable factfinder to disbelieve the reasons."); *Jackson v. State of Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (to demonstrate pretext, a plaintiff must show that the employer's offered reason was not the true reason for its decision, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence").

Rodney Harris, despite similar faults, including "many poor judgments," poor attitude and work ethic among his staff, poor delegation of tasks to subordinates, and situations in which "[t]he branch was not operating in a manner that it should be operating," "training was not being conducted as it should be," and the "overall performance" of the branch was wanting. (Remington Dep., at 99-103 & Exh. 7.)  Rather than discharging Harris, Weiser counseled him in writing and retained Harris as Birmingham branch manager for four more years.  (Remington Dep., Exh. 6.)  Personnel decisions concerning Harris were made by Kline, with recommendations from Remington, just as was the case for Brokaw.  (Remington Dep., at 84.)  Similarly, Kline wrote in 2004 that Weiser's Greensboro branch manager, Bobby Hussey, "does not have a good track record in retaining large jobs, does not speak up, and has on more than one occasion shown that he does not understand client needs."  (*Id.* at 52 & Exh. 3.)  Worse, Kline knew at that time that a Greensboro sales employee "couldn't stand to be in the office" under Hussey "to hear about all the negatives and problems."  (*Id.* at 49 & Exh. 3.)  Yet Weiser did not discharge Hussey until long after these concerns surfaced.  (*Id.* at 52-53.)  Taken together, this evidence yields a reasonable inference that when male branch managers did not foster a productive, healthy environment in their branches, Weiser took no action beyond counseling, but when a female manager (Brokaw) exhibited similar leadership flaws as to her branch, those same decisionmakers fired her without so much as a written reprimand.

By the same token, plaintiff has called into question Weiser's assertion that it terminated Brokaw's employment because her deficiencies were "a major factor in the Mobile branch's loss of four major accounts, including SMC."  (Doc. 23-1, at 20.)  Defendant identifies these accounts as "SMC, Solutia, Konica/Minolta and Great Southern Wood."  (*Id.* at 3.)  But the record in the light most favorable to Brokaw shows that the Mobile branch did not lose all of these accounts because of anything she did or failed to do.  Minolta ended its operations in Mobile altogether, such that it had no further need for Weiser's services.  Great Southern Wood canceled its contract after a Weiser employee was caught stealing lumber from it, a transgression that hardly seems attributable to Brokaw.  The record is devoid of evidence that the Solutia account was lost because of Brokaw's acts or omissions.  And Weiser did not learn that it was losing the SMC account until the very day it fired Brokaw, so the loss of that account could not have factored into the (previously made) decision to discharge her.  Thus, plaintiff's evidence creates serious doubts as to the veracity of defendant's explanation that she was discharged for losing four

substantial accounts. Moreover, plaintiff provides evidence that Weiser did not fire male branch managers who had lost multiple substantial accounts. (Doc. 28, at 13-14.)

In short, plaintiff has come forward with evidence that Weiser did not discharge male managers who had serious operational/leadership problems with their branches and who failed to retain critical accounts. Plaintiff has also come forward with evidence discrediting Weiser's contention that Brokaw's poor communication skills caused Weiser to lose four major accounts and that she was fired for that reason. Importantly, defendant has failed to proffer any explanation for why it treated Brokaw differently than male comparators who appear to be similarly situated, why it contends that Brokaw's communication problems caused the loss of the Konica, Solutia and Great Southern Wood accounts, or how the loss of the SMC account could have been a contributing factor to its decision to discharge Brokaw given the timing of SMC's cancellation of its contract. The Court cannot simply pluck from thin air possible justifications and reasonable nondiscriminatory rationalizations distinguishing Brokaw from her male counterparts, where defendant itself has never articulated them, much less presented evidence to substantiate them. On this record, the Court cannot tell why Weiser discharged Brokaw when it retained male managers who appeared to have comparable shortcomings. On this record, Weiser's stated reasons for the challenged personnel action are suspect, and genuine issues of fact remain. Thus, plaintiff has met her burden of showing such weaknesses and inconsistencies in Weiser's proffered reasons for discharging her that a reasonable factfinder could deem them unworthy of credence, and could find that gender discrimination was the real reason for the challenged personnel action. Defendant's Motion for Summary Judgment is **denied** as to the Title VII discriminatory discharge cause of action.

## V. Conclusion.

For all of the foregoing reasons, defendant's Motion for Summary Judgment (doc. 23) is **granted in part**, and **denied in part**. The Motion is **granted** as to (i) plaintiff's claim of retaliation under Title VII, and (ii) her claims of pay discrimination under Title VII and the Equal Pay Act as they relate to comparator James Hipp. Those causes of action are **dismissed with prejudice**. In all other respects, the Motion is **denied**.

DONE and ORDERED this 19th day of January, 2011.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE